**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Jedson Engineering, Inc.,

       Plaintiff,

    v.                              Case No. 1:08cv413

Spirit Construction Services, Inc., *et al.*,      Judge Michael R. Barrett

       Defendants.

**OPINION & ORDER**

This matter is before the Court upon the following motions:

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. 75.)

2.      Plaintiff's Motion for Summary Judgment on Trespass and Civil Conspiracy Claims (Doc. 76.)

3.      Plaintiff's Motion for Partial Summary Judgment on Intentional Interference with Prospective Economic Advantage Claim (Doc. 78.)

4.      Defendants' Motion for Partial Summary Judgment on Plaintiff Jedson Engineering, Inc.'s Copyright Infringement Claims (Counts 1-6) (Doc. 89.)

5.      Plaintiff's Motion for Partial Summary Judgment on Copyright Counts I - IV (Doc. 90.)

6.      Defendant Spirit Construction Services' Motion for Partial Summary Judgment on Plaintiff's Civil Conspiracy and Good Faith and Fair Dealing Claims (Counts 17-20) (Doc. 92.)

7.      Defendant Baisch Engineering's Motion for Summary Judgment on Plaintiff's Claim for Violation of 17 U.S.C. 1202 (Count 21) (Doc. 97.)

8.      Defendants' Motion for Summary Judgment on Plaintiff's Non-Copyright Claims (Counts 8-16) (Doc. 102.)

9.      Baisch Engineering's Motion for Summary Judgment on Counts 1-6

(Doc. 104.)[1]

All of the above motions have been fully briefed.

## I.  **BACKGROUND**

Jedson's claims arise out of three projects involving the design and construction of tissue manufacturing plants.  The facts are largely not in dispute.

The first project was a tissue manufacturing plant for the Cellynne Corporation in Haines City, Florida ("Cellynne Project").  The second project was a tissue plant for the Lincoln Paper and Tissue company in Lincoln, Maine ("Lincoln Project").  The design for the Lincoln Project was similar to and used many of the same drawings as the Cellynne Project.  (Doc. 76-1, David Ritchie Aff. ¶ 2.)  Drawings for the project were maintained on a worksite server controlled and leased by Jedson.  (Id.)

A third tissue plant for Royal Paper Product in Gila Bend, Arizona became available for bid.  Rather than working with Jedson, Spirit worked with Baisch to submit a bid for this project ("Doubletree Project").  Baisch's president, Kurt Kloehn, traveled to Arizona with representatives from Spirit to meet with Royal Paper.  (Kloehn Dep. at 18-19.)  Baisch created block flow diagrams and general layouts for a tissue plant encompassing a 200-inch machine. (Bosar Dep. at 13-16.)  Spirit made a proposal to Royal Paper, which included Baisch's designs.  (Barone Dep. at 24-26.)

Spirit later learned that Royal Paper wanted to consider a less expensive project using a 100-inch tissue machine, instead of the 200-inch tissue machine Spirit had originally proposed.  (Barone Dep. at 33-35.)  Spirit issued a purchase order to Jedson for

---

[1]Spirit has filed a memorandum joining in Baisch's Motion.  (Doc. 107.)

the preparation of some "concept" drawings using a 100-inch tissue machine. (Barone Dep. at 53, 57; Simmons Dep. at 56-57; Dep. Ex. 70; Dep. Ex. 134.) Royal Paper accepted the new proposal and Spirit entered into a contract with Royal Paper on July 19, 2006. Soon after finalizing the contract with Royal Paper, on July 26, 2006, Spirit began negotiations with Jedson to finalize Jedson's contract scope and pricing. However, Spirit concluded that Jedson's price was too high. (Barone Dep. at 64-65; Deposition of Steven Van Den Heuvel at 97-98; Dep. Exs. 2, 73, 74.) Spirit contacted Baisch about submitting a bid, and informed Baisch that if it could perform the work for $1.1 million, Baisch would be awarded the subcontract. (Dep. Ex. 2.) Spirit told Baisch that it would have access to the drawings from the Lincoln and Cellynne Projects. In an email summarizing the discussions between the parties, Gary Bosar of Baisch wrote:

> [Baisch] will have access to all the engineering documents from the previous two projects. I was given the project website information and password for the Lincoln project and we will be given a CD of the Cellynne Project. All drawings will be available to Baisch in .dwg format.

(Dep. Ex. 2.) Baisch agreed to perform the project on August 4 for the $1.1 million amount. (Bosar Dep. at 20; Kloehn Dep. at 50-51, 64-65; Dep. Ex. 2.)

In its Second Amended Complaint (Doc. 82), Jedson brings claims against Spirit for: (1) copyright infringement based upon the drawings for the Cellynne Project (Count I); (2) copyright infringement based upon the drawings for the Lincoln Project (Count II); (3) copyright infringement based upon the drawings for the Doubletree Project (Count V); (4) breach of contract based upon the Subcontract for the Lincoln Project (Count VII);[2] (5) violation of Ohio's Trade Secrets Act based upon the drawings for the Cellynne Project

---

[2]This Count was dismissed by stipulation in light of the Court's previous Orders. (Doc. 47.)

(Count VIII); (6) violation of Ohio's Trade Secrets Act based upon the drawings for the Lincoln Project (Count IX); (7) violation of Ohio's Trade Secrets Act based upon the drawings for the Doubletree Project (Count XII); (8) civil conspiracy (Count XVII); (9) breach of implied duty of good faith and fair dealing based upon the Lincoln Project (Count XVIII); (10) breach of implied duty of good faith and fair dealing based upon the Cellynne Project (Count XIX); breach of implied duty of good faith and fair dealing based upon the Doubletree Project (Count XX); and (11) violation of 17 U.S.C. 1202 for removal or alteration of copyright management information (Count XXI).

Jedson brings claims against Baisch for: (1) copyright infringement based upon the Cellynne Project (Count III); (2) copyright infringement based upon the drawings for the Lincoln Project (Count IV); (3) copyright infringement based upon the drawings for the Doubletree Project (Count VI); (4) violation of Ohio's Trade Secrets Act based upon the drawings for the Cellynne Project (Count X); (5) violation of Ohio's Trade Secrets Act based upon the drawings for the Lincoln Project (Count XI); (6) violation of Ohio's Trade Secrets Act based upon the drawings for the Doubletree Project (Count XIII); (7) intentional interference with prospective economic advantage (Count XIV); (8) trespass to chattels (Count XV); (9) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (Count XVII); and (10) violation of 17 U.S.C. 1202 for removal or alteration of copyright management information (Count XXI).

II.  **ANALYSIS**

    A.  **Motion for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party.  *Id.* at 252.

### B.    Copyright Act (Counts I, II, III, IV, V, VI)

Jedson argues that it is entitled to summary judgment on its copyright claims against Spirit and Baisch.  (Docs. 75, 90.)  Defendants argue that instead, they are entitled to summary judgment on these claims.  (Docs. 89, 104.)

To sustain a case of copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying [by the defendants] of constituent elements of the work that are original."  *Hi-Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995), *quoting Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

### 1.    Ownership of valid copyright

Jedson claims it is the owner of valid copyrights in the Cellynne, Lincoln and

Doubletree drawings.[3]  On November 17, 2007, the Copyright Office issued Certificates of Registration for the Cellynne Drawings: (1) Registration No. VA0001632527 for Tissue Machine Facility 1 (Cellynne) (Architectural Work); and (2) Registration No. VA0001632529 for Tissue Machine Facility 1 (Cellynne) (Technical Drawing).  (Doc. 75-3.)  The Copyright Office issued Certificates of Registration for the Lincoln Drawings: (1) Registration No. VA0001632532 for Tissue Machine Facility 2 (Lincoln) (Technical Drawing); and (2) Registration No. VA0001632535 for Tissue Machine Facility 1 (Lincoln) (Architectural Work).  (Id.)  The Copyright Office issued Certificate of Registration No. VA0001632538.26 for the Doubletree Concept Drawings.  (Id.)

A certificate of copyright registration constitutes "*prima facie* evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c).  Defendants have attempted to rebut this presumption.  *See Hi-Tech Video*, 58 F.3d at 1095 (explaining

---

[3]Section 102 of the Copyright Act states:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

(1) literary works;

(2) musical works, including accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

17 U.S.C. § 102.

that the party challenging the copyright bears the burden of rebutting presumption).

Defendants argue that Jedson is not entitled to a presumption of validity because of irregularities in the registration of Jedson's copyrights. Defendants argue that Jedson made material misrepresentations in registration because (1) the original registrations included a date of publication, but Jedson later supplemented the registrations to state that the works were unpublished; (2) the drawings include pre-existing content, which Jedson did not disclose; (3) Pine Ridge and Strategic Facilities Solution were authors but were not disclosed; and (4) the drawings are identified as "works for hire" in the registration but Pine Ridge employees created the drawings, not Jedson employees.

As one district court has aptly explained:

> While the affirmative defense of fraud can serve as a basis to rebut the presumption of validity attached to a copyright registration certificate, the "party seeking to establish a fraud on the Copyright Office, and thereby rebut the presumption of copyright validity, bears a *heavy burden*." *Lennon v. Seaman*, 84 F.Supp.2d 522, 525 (S.D.N.Y. 2000) (citing 2 Nimmer on Copyright § 7.20[B] ) (emphasis added). "The party asserting the fraud must establish that the application for copyright registration is factually inaccurate, that the inaccuracies were willful or deliberate, and that the Copyright Office relied on those misrepresentations." *Shady Records, Inc.*, 2004 U.S. Dist. LEXIS 26143, at *28 (quoting Lennon, 84 F.Supp.2d at 525). "Neither innocent misstatements, nor deliberate, but nonmaterial misstatements, will overcome the presumption of validity." *Id.*; *see Advisers, Inc. v. Wiesen-Hart, Inc.*, 238 F.2d 706, 708 (6th Cir. 1956) ("[A]n innocent misstatement, or a clerical error, in the affidavit and certificate of registration, unaccompanied by fraud or intent to extend the statutory period of copyright protection, does not invalidate the copyright, nor is it thereby rendered incapable of supporting an infringement action."). Material misstatements in a copyright registration application "are those which go toward the registrability of the materials themselves, such as originality . . . the nature of materials to be copyrighted . . . and contested claims of authorship and ownership." *Shady Records, Inc.*, 2004 U.S. Dist. LEXIS 26143, at *35 (citations omitted); *see Eckes v. Card Prices Update*, 736 F.2d 859, 861-62 (2d Cir. 1984) ("Only the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute reason for holding the registration invalid and thus incapable of supporting

an infringement action . . . or denying enforcement on the ground of unclean hands . . . .") (internal quotations omitted).

*Tacori Enterprises v. Rego Mfg.*, 2008 WL 4426343, *14 (N.D.Ohio Sept. 25, 2008) (unpublished).  The Court finds that Defendants have not carried their heavy burden of demonstrating the affirmative defense of fraud.  Defendants have done little to show any inaccuracies regarding originality or authorship which were willful or deliberate. Defendants' legal-based arguments regarding originality and authorship do not equate to evidence of fraud.  Defendants have also done little to identify material misstatements which go toward registrability.  Specifically, Defendants have not explained how the publication date or the classification of "work for hire" have an effect on registrability. Therefore, Defendants are not entitled to summary judgment based upon their theory of fraud.

Next, Defendants argue that Jedson is not entitled to the statutory presumption of validity because the drawings are not "original."

"Because originality of the author is a necessary condition to the validity of the copyright, it follows that a certificate of registration, properly obtained within the prescribed five-year period, constitutes *prima facie* evidence of the author's originality."  3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.11[B][1].  The United States Supreme Court has stated that:

> Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.  To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be.

*Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345 (1991), *quoting* 1 Nimmer & Nimmer, Nimmer on Copyright § 1.08[C][1].

Defendants argue that the drawings are not original because Jedson used pre-existing third-party materials in the drawings.  For example, Defendants point out that the drawings include standard drawing equipment blocks from Metso, the manufacturer of the machine to be installed in the tissue plant.  Jedson does not dispute that its drawings include vendor-supplied drawings which were copied or redrawn to provide accurate representations of the space occupied by the purchased item.  (Doc. 75-2, David Ritchie Decl., ¶ 2.)  Jedson also acknowledges that the Site Plan, which shows existing buildings, roadways, property boundaries, easements, and utilities, was drawn by another firm and Jedson used this drawing to show the location of the new construction in its drawings.  (Id.)

The Supreme Court has explained that compilations of pre-existing material "may possess the requisite originality" to warrant copyright protection, where, for example, the "compilation author . . . chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers."  *Feist*, 499 U.S. at 348.  The Court explained further that raw facts are not copyrightable, but choices relating to the selection and arrangement of facts in a compilation are copyrightable "so long as [these choices] are made independently by the compiler and entail a minimum degree of creativity. . . ."  *Id.*  As a consequence, "[e]ven a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement."  *Id.*

Accordingly, contrary to Defendants' argument, Jedson's drawings are entitled to copyright protection even though they contain pre-existing material.  All that is required is

that the choices relating to the selection and arrangement of these elements were made independently and entail a "minimum degree of creativity."  Jedson has presented evidence that the designs in the Cellynne drawings were not based on any other tissue plant design. (Doc. 75-1, Carl Fischer Aff., ¶ 1.)  Defendants have not presented any evidence which contradicts this evidence that the design choices were made independently.  Therefore, the Court finds that Defendants have not overcome the statutory presumption of originality.

Defendants next argue that even if the drawings are original, they are "functional" rather than "creative."  Defendants rely on 17 U.S.C. §102(b), which provides: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  The Sixth Circuit has explained that:

> This provision embodies the common-law idea-expression dichotomy that distinguishes the spheres of copyright and patent law. "[U]nlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea-not the idea itself."  *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *see also Baker v. Selden*, 101 U.S. 99, 101-02, 25 L.Ed. 841 (1879) (explaining that while a book describing a bookkeeping system is worthy of copyright protection, the underlying method described is not); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 703 (2d Cir. 1992) ("It is a fundamental principle of copyright law that a copyright does not protect an idea, but only the expression of the idea.").

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004).  The court also explained: "In ascertaining this 'elusive boundary line' between idea and expression, between process and non-functional expression, courts have looked to two other staples of copyright law-the doctrines of merger and scènes à faire."  *Id.* at 535.  In trying to discern whether these doctrines apply, courts tend to "focus on whether the

idea is capable of various modes of expression." *Id.* at 536, *quoting Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 138 (5th Cir. 1992).  However, the Sixth Circuit has also made it clear that the question "is not whether *any* alternatives theoretically exist under the circumstances; it is whether other options practically exist under the circumstances."  *Id.* (emphasis in original).

Under the merger doctrine, "when there is essentially only one way to express an idea, the idea and its expression are inseparable [*i.e.*, they merge,] and copyright is no bar to copying that expression."  *Kohus v. Mariol*, 328 F.3d 848, 856 (6th Cir. 2003) (alteration in original, internal citation omitted); *see also Lexmark*, 387 F.3d at 535 (explaining that where the "expression is essential to the statement of the idea," . . . or where there is only one way or very few ways of expressing the idea, . . . the idea and expression are said to have "merged.").

Similarly, the Court must filter out scènes à faire, "those elements that follow naturally from the work's theme, rather than from the author's creativity or elements that are dictated by external factors such as particular business practices."  *Kohus*, 328 F.3d at 855 (internal quotations and citations omitted).

The Court notes that Jedson is not claiming copyright protection for an idea, procedure, process, system, method of operation, concept, principle, or discovery.  Jedson is seeking protection for its drawings, which is the expression of its ideas.  The record is replete with evidence showing that there are numerous ways to express Jedson's ideas. For instance, one of the copyrighted drawings for the Lincoln project shows a birds-eye view of the floor plan.  (Fisher Aff., Ex. 1.)  Jedson has presented the same idea in four other drawings, from different perspectives, in different dimensions, and with different

information.  (Id., Exs. 2-5.)  Defendants' expert, Michael Waller, agreed that there would be more than one way to depict a piece of equipment or the design of a building.  (Doc. 113, Ex. 6, Michael H. Waller Dep. at 168.)  Defendants have not presented any evidence that these alternatives are not "feasible within real-world constraints."  Lexmark, 387 F.3d at 536. Therefore, the Court finds that the merger doctrine does not bar copyright protection for Jedson's drawings.

The Court also finds that the scènes à faire doctrine does not serve to bar Jedson's claims.  While there were certain requirements Jedson had to satisfy, such as permit requirements, equipment specifications and constraints inherent in the site itself, Jedson used its creativity to determine how to satisfy these requirements.  Waller, Defendants' own expert,  testified that despite the function of each of the pieces of equipment, there could be "slightly different arrangements" in the design of a plant.  (Waller Dep., at 131, 156.) Defendants have not cited any evidence that there was only one solution to meeting the requirements they have identified.  Again, when asked whether the "bale pulper" needed to be right next to the paper machine, Waller explained that it could be somewhere else. (Id. at 160.)  Therefore, Defendants have not overcome their burden of showing that the copyrights are not valid.

Defendants also argue that Jedson is not entitled to the presumption of ownership. Defendants point out that on both the Cellynne and Lincoln Projects, Spirit entered into general contracts with the project owners, and then in turn entered into subcontracts with Jedson.  (Roach Decl. Exs. 24 and 25, Dep. Exs. 97, 113.)  The subcontracts incorporated by reference the terms of the general contracts, which provide:

[The owner] shall have title to all drawings (including but not limited to CAD

> and other electronic drawings), specifications, work completed or in the course of construction or installation, all materials and supplies delivered to the premises which are to become a part of the completed Work.  Risk of loss or damage to such work, materials, equipment and supplies shall remain with Spirit Construction Services, Inc. until final acceptance of the Work by Lincoln Paper and Tissue.

(Roach Decl. Ex. 25, Dep. Ex. 113, at 10; Dep. Ex. 97, at 25.)  Jedson points out that this term is found in the section of the general contracts which addresses risk of loss. Moreover, Jedson argues, the subcontracts provide for transfer of actual drawings not copyrights.

The Copyright Act itself makes it quite plain that the ownership of a copyright is distinct from ownership of a material object:

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.  Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

17 U.S.C. § 202.  There is nothing in the contractual language cited by Defendants which provides for the transfer of the copyrights themselves, or any of the exclusive rights under a copyright.  The contractual language appears in a section entitled "Risk of Loss: Title to Materials and Equipment."  Absent is any reference to intellectual property.  Moreover, unlike the contractual provisions in the cases cited by Defendants, the language in these general contracts is not broad enough to cover copyright ownership.  In those cases, the contracts provided for a transfer of "all right, title and interest" in the materials, *see e.g.*, *Shugrue v. Continental Airlines, Inc.*, 977 F.Supp. 280 (S.D.N.Y. 1997).  In contrast, the contracts here only provides for "title to all the drawings."  Clearly, this language covers

only title to all drawings, not all right, title and interest in the drawings.  Therefore, Defendants are not entitled to summary judgment based on their argument that this language in the general contracts rebuts the presumption of Jedson's ownership of the copyrights in the Cellynne or Lincoln drawings.

The Court is equally as unimpressed with Defendants' argument that Pine Ridge Engineering contributed to the drawings, and therefore Jedson is not the owner of the copyrights.  As the contract language between Jedson and Pine Ridge makes clear: "All creation, ideas, discoveries, developments and inventions made in performance of this [Purchase] Order shall become the property of [Jedson]."  (Doc. 75-6, at 4.)

As to the Doubletree drawings, Defendants argue that Spirit purchased the Doubletree drawings, and Spirit has an implied nonexclusive license in the drawings.

The Sixth Circuit has explained that the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement.  *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998), *citing Effects Associates, Inc. v. Cohen*, 908 F.2d 559 (9th Cir. 1990), *cert. denied* 498 U.S. 1103 (1991); *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996).  The court explained further that it is well-settled that a non-exclusive license is not a transfer of ownership, and is not, therefore, subject to the writing requirement of 17 U.S.C. § 204.[4]  Defendants argue that the facts of this case are similar to those in the Seventh Circuit's decision in *Shaver*, which was relied upon by the Sixth Circuit in *Johnson*.

In *Shaver*, two construction companies formed a joint venture to construct a hangar building for an airport.  74 F.3d at 770.  The joint venture hired the defendant, an architect,

---

[4]17 U.S.C. § 204 (a) provides: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."

to prepare schematic drawings for the first phase of the building design.  *Id.*  The parties entered into an agreement which stated that the defendant would prepare the schematics for the price of $10,000.  *Id.*  When the schematics were complete, the defendant delivered them to the airport, the joint venture, and the other parties involved in the project.  *Id.* at 771.  The defendant was paid $5,000.  *Id.*  The joint venture then hired another architect to finish the project.  *Id.*

The Seventh Circuit explained that an implied nonexclusive license has been granted when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work."  *Id.* at 776, *citing Effects*, 908 F.2d at 558-59.  The court found based upon the copyright registration certificate language, the written agreements between the parties, the deposition testimony, and "the delivery of the copyrighted material without warning that its further use would constitute copyright infringement," the defendant had granted an implied nonexclusive license had been granted in the schematics.  *Id.* at 777.

The Sixth Circuit, in *Johnson*, found the following elements in *Shaver* to be crucial: "(1) a written contract precisely describing the work to be done and the price to be paid; (2) a clear expression of Shaver's intent that his schematics be used for the first phase of the project, and that his involvement in any later phases would need to be negotiated in separate contracts; and (3) payment (albeit less than was agreed upon) for the use of Shaver's schematics."  149 F.3d at 501.

The Court finds that the facts of this case fall short of those found to be crucial in *Johnson*.  There is no written contract which precisely describes the work to be done by

Jedson.  Defendants have presented the purchase order from Jedson, which along with the price to be paid, only states: "Jedson Engineering to provide: Engineering, Flow Diagrams, Building Layout, Equipment List."  (Doc. 105, Ex. 18.)  Defendants have also presented Jedson's proposal which includes a project description.  The project description explains that the proposed scope of the work includes:

- Teleconference with SCS to define project.
- Develop the following bid documents:
    - Equipment layouts
    - Process Flow Diagrams
    - Equipment List
    - Single Line Diagrams
    - Architectural Elevations
    - Follow up reviews.

(Id., Ex. 31.)  The "Deliverables" to be provided by Jedson consists of the following list, without any explanation or definition of each item:

- Equipment layouts
- Process Flow Diagrams
- Equipment List
- Single Line Diagrams
- Architectural Elevations

(Id.)

Next, while Defendants make the argument, there is no evidence that it was Jedson's intent that its continued involvement in the project would need to be negotiated in a separate contract.  Defendants rely on language in the proposal, which states: "In the event that SCS requests or requires changes in the proposed scope of work throughout the project, these changes shall be quoted separately."  (Id.)  The Court finds that this is not a clear expression that work beyond the bid phase would be negotiated separately. When reading the document as a whole, it is not clear whether the term "project" refers to

only the bid phase or the entire construction project. In addition, in contrast to the clear and unambiguous contract language in *Shaver* which demonstrated that the defendant had no expectation of a further role in the project, the purchase order and proposal are silent as to what Jedson's role would be beyond the bid phase of the project. Therefore, the Court finds that without evidence of Jedson's intent, there is no basis to find that a implied nonexclusive license was granted by Jedson.

Based on the foregoing, the Court finds that Jedson is entitled to summary judgment on the issue of ownership; and Defendants are not entitled to summary judgment on this issue. Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. 75) is GRANTED to the extent it is based upon the issue of ownership of a valid copyright; Defendants' Motion for Partial Summary Judgment on Plaintiff Jedson Engineering, Inc.'s Copyright Infringement Claims (Counts 1-6) (Doc. 89) is DENIED; and Defendants' Motion for Summary Judgment (Doc. 104) is DENIED to the extent it is based upon the issue of ownership of a valid copyright.

## 2. Copying

Defendants do not dispute that copying occurred, or that Spirit contributed to the alleged infringement by providing Jedson's password and CD-ROM to Baisch. *See Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004) ("[c]ontributory infringement occurs when one, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another."). Instead, Defendants argue that Jedson's claims must fail because it cannot show that the Jedson drawings were substantially similar to the final Baisch drawings. Jedson argues that it is not required to show "substantial similarity" because in this case there is direct evidence

of copying.

In most copyright infringement cases, direct evidence of copying does not exist. Where there is no direct evidence, the Sixth Circuit has held that the plaintiff may establish an inference of copying by showing: "(1) access to the allegedly-infringing work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Kohus*, 328 F.3d at 854.

Some courts have made it clear that regardless of how copying is proved, the plaintiff also must establish that the allegedly infringing work is substantially similar to the plaintiff's work with regard to its protected elements. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137-38 (2d Cir. 1998) ("To demonstrate unauthorized copying, the plaintiff must first 'show that his work was actually copied'; second, he must establish 'substantial similarity' or that 'the copying amounts to an improper or unlawful appropriation,' *i.e.*, (i) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is 'more than de minimis.'"); *see also* Nimmer & Nimmer, Nimmer on Copyright § 13.01[B] ("hence, substantial similarity remains an indispensable element of plaintiff's proof, even in cases (such as *Feist*) in which defendant does not contest factual copying.").[5]

The parties have failed to make this distinction, understandably so because there is no Sixth Circuit decision which makes it clear that substantial similarity is a part of the

---

[5]Of course, using the term "substantial similarity" in two distinct portions of copyright analysis can be confusing, and so it has been suggested that the term "probative similarity" should be used when looking for copying, and "substantial similarity" used when determining actionable copying. Nimmer & Nimmer, Nimmer on Copyright § 1301[B].

copyright infringement inquiry in cases where there is direct evidence of copying. However, the Court concludes that this analysis is the proper one. As the Supreme Court has made clear, "[n]ot all copying . . . is copyright infringement." *Feist*, 499 U.S. 361; *see also Ross, Brovins & Oehmke, P.C. v. Lexis/Nexis*, 348 F.Supp.2d 845, 855 (E.D.Mich. 2004) (explaining that not all copying is copyright infringement and to determine infringement, a court must decide if the works are substantially similar). Therefore, this Court concludes that if actual copying is established by means of direct evidence, a plaintiff must then show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works. *See Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992).

This concept is reflected in the Sixth Circuit's two-part test for substantial similarity: the first step 'requires identifying which aspects of the [plaintiff]'s work, if any, are protectible by copyright. . . .'[T]he second [step] 'involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the [plaintiff]'s work. . . .' *Kohus*, 328 F.3d at 855 (citations omitted).

As discussed above, Jedson does not dispute that its drawings include both vendor-supplied drawings and the Site Plan, which was drawn by another firm. Clearly, these elements are not original and would be "filtered out" as part of the first step. *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009), *citing Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 318 (6th Cir. 2004).

"Once the unprotectable elements have been filtered out, the two works can be compared to determine whether they are substantially similar, a question of fact." *Id.* at 275. "Substantial similarity exists where 'the accused work is so similar to the plaintiff's

work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value.'" *Stromback v. New Line Cinema*, 384 F.3d 283, 297 (6th Cir. 2004), *quoting Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996).  The Sixth Circuit has explained that in copyright infringement cases, "summary judgment, particularly in favor of a defendant, is a practice to be used sparingly" because substantial similarity is often an extremely close question of fact, but "a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity." *Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009), *quoting Kohus*, 328 F.3d at 853.

Jedson has not presented evidence in support of its Motion for Summary Judgment which demonstrates substantial similarity between its copyrighted drawings and the drawings of Baisch.  Therefore, the Court finds that Jedson is not entitled to summary judgment on the issue of copyright infringement and the determination of the issue of substantial similarity is for the jury.  Accordingly, Plaintiff's Motion for Partial Summary Judgment on Copyright Counts I - IV (Doc. 90) is DENIED.

### 3.    Laches

Finally, Defendants argue that Jedson's copyright claims are barred by laches because it waited nine months to raise the claims.

Laches is "a negligent and unintentional failure to protect one's rights." *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007).  "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.*  While the Sixth Circuit has recognized the

application of the doctrine of laches in the context of a copyright claim, the Sixth Circuit has cautioned that its use is limited "to the most compelling of cases." *Id.* The court explained:

> Laches does not result from a mere lapse of time but from the fact that, during the lapse of time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now to be enforced. By his negligent delay, the plaintiff may have misled the defendant or others into acting on the assumption that the plaintiff has abandoned his claim, or that he acquiesces in the situation, or changed circumstances may make it more difficult to defend against the claim.

*Id.* (citations omitted). Defendants have not presented any evidence which would lead to a finding of undue prejudice. *See id.* ("we cannot conclude that the defendants were unduly prejudiced by the plaintiffs' delay in filing this cause of action.") (emphasis in original). For the most part, Defendants rely on Jedson's nine month delay. The only prejudice identified is that Baisch was ninety percent complete with its work on the Doubletree Project by May of 2007. (Doc. 100, Keith Piepenburg Decl., ¶ 12.) These facts do not place this case in the category of the "most compelling cases" where the application of laches is appropriate. Therefore, Defendants' Motion for Summary Judgment (Doc. 104) is DENIED to the extent it relies upon the doctrine of laches.

### C.   Ohio Trade Secrets Act (Counts VIII, IX, XII, X, XI, XIII)

Defendants argue they are entitled to summary judgment on Jedson's claims under Ohio's Trade Secrets Act. (Doc. 102.) Jedson claims their drawings contained trade secrets in the form of technical information, vendor lists, parts lists, designs, processes, methods and techniques.

Under the Ohio Trade Secret Act:

(D)"Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or

improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). The Ohio Supreme Court has also adopted the following factors in analyzing a trade secret claim:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 377-78 (Ohio 2000), *quoting State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 687 N.E.2d 661, 672, (Ohio 1997). "An entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *Id.*, *citing Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999).

Defendants argue that Jedson's claimed trade secrets were known and practiced in industry. Defendants rely on the testimony of Dan Platkowski, president of Pine Ridge, and Keith Pipenburg, a principal at Baisch, and Jedson's expert, Keith Otto. Jedson responds that while elements of design may have been known for years, Jedson's

combination of those elements was not.  Jedson cites the portion of Otto's testimony wherein he clarifies that while he has seen each of the items Jedson claims as a trade secret, but only as individual installations.  (Doc. 93,  Keith Dep. at 24.)  The Court finds that there are genuine issues of material fact with regard to the extent to which the Jedson's claimed trade secrets were known outside the business.

Defendants next argue that Jedson provided drawings to third parties without any obligation to keep info confidential.  Defendants point out that there was no confidentiality provision in either of Jedson's subcontracts with Spirit.  Defendants also point out that third parties such as Spirit, Metso, Pine Ridge, and Lincoln were given access to the Lincoln Project website without an obligation to keep the information confidential.

Jedson responds that these parties were under an implied obligation of confidentiality.  The Court finds no support for such an implied obligation under Ohio law, and therefore it rejects Jedson's position.  Moreover, the Ohio Supreme Court has emphasized that "[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status." *Plain Dealer*, 687 N.E.2d at 672.  The Court concludes that Jedson has not carried its burden with respect to showing active steps it took to maintain secrecy of the information in its drawings vis-a-vis third parties.

Therefore, Defendants are entitled to summary judgment on Jedson's claims under the Ohio Trade Secrets Act (Counts VIII, IX, XII, X, XI, XIII) and Defendants' Motion for Summary Judgment on Plaintiff's Non-Copyright Claims (Counts 8-16) (Doc. 102) is GRANTED to the extent it moves for summary judgment on these claims.

**D.    Intentional interference against Baisch (Count XIV)**

Jedson argues that it is entitled to summary judgment on its claim for intentional interference with prospective economic advantage, which is brought against Baisch only. (Doc. 78.)  Baisch also argues that it is entitled to summary judgment on this claim.  (Doc. 102.)

Under Ohio law, the elements of tortious interference with a business relationship are (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom."  *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 774 N.E.2d 775, 780 (Ohio Ct. App. 2002); *see also A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995) (explaining that the tort of interference with business relationship generally occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another.").

Jedson argues that there was a business relationship between Jedson and Spirit because there was an understanding that if Spirit was awarded the contract based on Jedson's design, Jedson would be engineer on the Doubletree Project.  Baisch argues that Jedson's prior business relationship with Spirit did not entitle Jedson to an expectation that it would be awarded contract for Doubletree.

Ohio courts have held that a claim for intentional interference with a business relationship includes intentional interference with prospective contractual relations not yet reduced to a contract.  *Dolan v. Glouster*, 879 N.E.2d 838, 848 (Ohio Ct. App. 2007).

There is no dispute that before the Doubletree Project, Spirit and Jedson had worked together on three other projects.  (Doc. 78, Ex. 23, Glenn Simmons Dep. at 10.)[6]  It is clear that Baisch had knowledge of this relationship because Spirit informed Baisch that Jedson had performed the engineering design for the Cellynne and Lincoln Projects, and that Jedson had submitted a bid for the engineering design work on the Doubletree Project. (Doc. 78, Ex. 3.)

Baisch argues that even if a business relationship existed, as a competitor of Jedson, Baisch's conduct was privileged.  Ohio law recognizes the defense of privilege, which is the subject of sections 766 and 767 of the Restatement (Second) of Torts.  *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 128 (6th Cir. 1992).  To determine whether defendant's conduct is improper or privileged, Ohio courts look to factors such as (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests interfered with, (4) the interests sought to be advanced by the actor, (5) the societal interests in protecting the freedom of action and the contractual interests of the plaintiff, (6) the proximity or remoteness of the interference, and (7) the relations of the parties. *Dryden v. Cincinnati Bell Tel.*, 734 N.E.2d 409, 414 (Ohio Ct. App. 1999), *citing* Restatement of the Law (Second), Torts § 767.  As one Ohio court has noted, Section 771 of the Restatement applies specifically to a claim of privilege by a business competitor. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 662 N.E.2d 1088, 1092 (Ohio App. Ct. 1995).  Section 771 provides:

> One who intentionally causes a third person not to enter into a prospective

---

[6]The third project was called "Wildfire" and was located in Wisconsin.  This project is not a part of this litigation.

contractual relation with another in order to influence the other's policy in the conduct of his business does not interfere improperly with the other's relation if

(a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other and

(b) the desired policy does not unlawfully restrain trade or otherwise violate an established public policy and

(c) the means employed are not wrongful.

To support its argument that its conduct was privileged, Baisch has presented evidence that it was Spirit who contacted Baisch about submitting a bid on the Doubletree Project.  (Doc. 105, Ex. 3, Bosar Dep. at 20.)  Baisch notes that Spirit represented to Baisch that it would use several of the design concepts from the Cellynne and Lincoln Projects, including the basement, the operating and mezzanine floor plans, the modular steel machine track design and auxiliary equipment.  (Dep. Ex. 2.)  Spirit also stated that it would provide the Cellynne and Lincoln Project drawings in a ".dwg" format, which could be imported and modified.  (Bosar Dep. at 38.)  Spirit told Baisch that if Baisch could provide engineering services for $1.1 million, it would award the project to Baisch. (Dep. Ex. 2; Bosar at Dep. 36-41; Barone Dep. at 99.)

Baisch contends that before Kurt Kloehn, Baisch's president, submitted a bid to Spirit, he did not access any of the Jedson drawings.  (Kloehn Dep. at 44, 58-59; Piepenburg Decl., ¶ 14.)  Baisch also maintains that to the extent its $1.1 million bid was premised on access to Jedson's drawings, Baisch understood that Spirit had rights to these drawings and Jedson's permission to use them.  (Kloehn Dep. at 53, 60-62, 65-66; Bosar Dep. at 47-48.)

Jedson responds that while Kloehn may not have accessed the drawings before

submitting Baisch's bid to Spirit, there is no dispute that other Baisch employees accessed the information.  The Court notes that the record contains an email from Gary Bosar of Baisch to Spirit regarding the Lincoln Project website.  The email is dated August 3, 2006 and states:

> We are able to access this website, view and printout the drawings on the website, however, there are only accessible as AutoCAD DWF files which means we can't import and modify them.  We would have to redraw all of them.  Therefore, they are of some, but substantially reduced value to us.

> We need for you [to] verify before we can give you a final decision if they woll be available as DWG files.  We also need to know what format the equipment lists and other documentation will be provided in.  A PDF format can't be imported and modified.  It first has to be recreated.  PDF format has significantly less value to us.

(Doc. 78, Ex. 4)

The Court finds that based upon the above evidence, there is a genuine issue of material fact as to whether Baisch used improper means or otherwise acted without privilege.

Finally, Baisch again raises the argument of preemption.  The Court previously addressed in this argument and ruled against Baisch.  (Doc. 81.)  Baisch now argues that evidence in the record shows that Baisch did not solicit Spirit for Jedson's information, but instead, Spirit approached Baisch and told Baisch what price it had to meet.  The Court finds that the gloss that Baisch puts on the facts of this case does not change the analysis set forth by the Court in its previous Order.  Regardless of whether Baisch solicited Spirit for the information, or Spirit volunteered the information, the question is whether Baisch's use of the information to underbid Jedson was improper or privileged.  As the Court explained previously, this "extra element" precludes preemption.  Therefore, Baisch is not

entitled to summary judgment on this basis.

Based on the foregoing, Plaintiff's Motion for Partial Summary Judgment on Intentional Interference with Prospective Economic Advantage Claim (Doc. 78) is DENIED; and Defendants' Motion for Summary Judgment on Plaintiff's Non-Copyright Claims (Counts 8-16) (Doc. 102) is DENIED to the extent it seeks summary judgment Jedson's claim for intentional interference with prospective economic advantage.

### E.     Trespass against Baisch (Count XV)

Jedson argues that it is entitled to summary judgment on its trespass claim, which is brought against Baisch only.  (Doc. 76.)  Baisch also argues that it is entitled to summary judgment on this claim.  (Doc. 102.)

This Court has recognized a claim under Ohio law for trespass to chattels through the use of the Internet.  *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015, 1022 (S.D. Ohio 1997).  In doing so, this Court explained that a  trespass to chattel may be committed by intentionally using or intermeddling with the chattel in possession of another.  *Id.* at 1021, *citing* Restatement (Second) of Torts § 217, Comment e.  Section 217 of the Restatement (Second) of Torts discusses intermeddling:

> "Intermeddling" means intentionally bringing about a physical contact with the chattel.  The actor may commit a trespass by an act which brings him into an intended physical contact with a chattel in the possession of another, as when he beats another's horse or dog, or by intentionally directing an object or missile against it, as when the actor throws a stone at another's automobile or intentionally drives his own car against it.  So too, a trespass may be committed by causing a third person through duress or fraud to intermeddle with another's chattel.

The Restatement (Second) of Torts § 218 defines the circumstances under which a trespass to chattels may be actionable:

One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if, but only if,

    (a) he dispossesses the other of the chattel, or

    (b) the chattel is impaired as to its condition, quality, or value, or

    (c) the possessor is deprived of the use of the chattel for a substantial time, or

    (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest.

*Id.* at 1021-1022.

Baisch argues that Jedson cannot maintain its trespass claim because Jedson did not own the Lincoln drawings.  Baisch repeats its argument that Jedson was not the owner of the drawings based on the terms of the general contracts between Spirit and the project owners, which were incorporated by reference into the subcontracts between Spirit and Jedson.  The Court rejects this argument.  While the project owners may have had title to the copies of the drawings delivered to them, there is nothing in the contracts which gives the project owners title to the electronic copies of the drawings on Jedson's website.

Baisch next argues that Jedson cannot claim trespass because Jedson did not maintain or host the Lincoln Project website which Baisch accessed.  Instead, the website was hosted and operated by a company called Team Space.  (Doc. 105, Ex. 12, David Ritchie Dep. at 180, 182.)  Baisch argues that it is Team Space who has "possession" of the website.  Jedson responds that it need not be the owner of property, but it only needs to have a superior right to possession.  The Court finds this to be an accurate statement of Ohio law.  *See Fairfield Commons Condominium Ass'n v. Stasa*, 506 N.E.2d 237, 247 (Ohio Ct. App. 1985); *see also Northern Pac. R. Co. v. Lewis*, 162 U.S. 366, 372 (1896)

("Trespass de bonis asportatis assumes a taking of the property by the defendant out of the possession of the plaintiff, and, if the title be in a stranger, with which the defendant does not connect himself, that fact is no answer to the cause of action.  The possession of the plaintiff is enough, under such circumstances, against a wrongdoer.").  Because there is no dispute that Jedson had a possessory interest in the Lincoln Project website, Baisch's argument fails.

Baisch argues that Jedson cannot show intentional trespass because Baisch understood that Spirit had rights to the Lincoln drawings.  Comment c of section 217 of the Restatement of Torts explains the character of the intent necessary to make a trespass to chattels actionable:

> Such an intention is present when an act is done for the purpose of using or otherwise intermeddling with a chattel or with knowledge that such an intermeddling will, to a substantial certainty, result from the act.  It is not necessary that the actor should know or have reason to know that such intermeddling is a violation of the possessory rights of another.

The Court notes that Baisch does not dispute that it used a password to access Jedson's Lincoln Project website.  The Court finds that this act was for the purpose of using or otherwise intermeddling with the Lincoln Project website.  Whether Baisch understood it was violating Jedson's possessory rights is immaterial.

Next, Baisch argues that Jedson has admitted that there was no damage to its computer system or to any of the drawings on the Lincoln Project website.  Jedson responds that it has suffered harm in terms of the diminished value of servers as a safe, secure location for project files.

This Court has made it clear that for a trespass to chattels to be actionable, there must be some actual damage.  *CompuServe*, 962 F.Supp. at 1023, *quoting* Restatement

(Second) of Torts § 218, Comment e (distinguishing trespass to chattels from that of trespass to real property where damage is assumed and nominal damages are available). In *CompuServe*, the defendants were in the business of sending "spam" e-mails to the plaintiff's subscribers. *Id.* at 1015. The defendant's intrusions into the plaintiff's computer systems resulted in the plaintiff's customers receiving unwanted bulk e-mail messages. *Id.* at 1023. In response, many of the plaintiff's customers terminated their accounts. *Id.* This Court found that the harm to the plaintiff's business reputation and goodwill with its customers was actionable. *Id.*

The Court finds that the damage to Jedson's servers as a safe, secure location for project files is similar to the harm found actionable in CompuServe. *See also State Analysis, Inc. v. American Financial Services Assoc.*, 621 F.Supp.2d 309, 320 (E.D.Va. 2009) (finding that value of company's possessory interest in its computer network is impaired if unauthorized users access its password-protected areas). There is evidence in the record that as a result of the unauthorized access of the Lincoln Project website by Baisch, Jedson investigated ways in which the website could be made more secure. (Doc. 112-1)

Finally, Baisch resurfaces its argument that Jedson's trespass claim is preempted by federal copyright law. This Court has previously addressed and rejected this argument in ruling upon Baisch's Motion to Dismiss. (Doc. 81.) *Accord Snap-on Business Solutions Inc. v. O'Neil & Associates, Inc.*, 2010 WL 1539958, *10 (N.D.Ohio April 16, 2010) (slip op.) (holding that Copyright Act does not preempt trespass to chattels claim where plaintiff claims defendant trespassed upon physical computer servers). Baisch now argues that the Court should reconsider its ruling because there is evidence in the record which shows

that Jedson's Lincoln Project website was owned and operated by Team Space.  The Court finds that this additional fact has no bearing on the preemption analysis already set forth by the Court.

Based on the foregoing, Plaintiff's Motion for Summary Judgment on Trespass and Civil Conspiracy Claims (Doc. 76) is GRANTED to the extent it seeks summary judgment on Jedson's claim for trespass; and Defendants' Motion for Summary Judgment on Plaintiff's Non-Copyright Claims (Counts 8-16) (Doc. 102) is DENIED to the extent it seeks summary judgment on this claim.

### F.    Civil Conspiracy against Spirit (Count XVII)

Jedson argues that it is entitled to summary judgment on its civil conspiracy claim, which is brought against Spirit only.  (Doc. 76.)  Spirit also argues that it is entitled to summary judgment on this claim.  (Doc. 92.)

In Ohio, "civil conspiracy" has been defined as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."  *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987).

Spirit argues that Jedson has failed to satisfy the malice requirement.  Spirit claims that it had a reasonable and lawful excuse for providing Baisch with the password for the Lincoln Project website in that Spirit had a rational business reason.[7]

The malice required is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another."  *Williams v.*

---

[7]Spirit also argued that because there was no underlying tort of trespass by Baisch, the civil conspiracy claim must be dismissed.  The Court finds no need to address this argument given its disposition of the trespass claim against Baisch.

*Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998).  There is no dispute that Spirit provided Baisch with access to the Lincoln Project website and CD-ROM without Jedson's authorization.  The Court finds that there is a genuine issue of material fact as to whether the requisite state of mind has been met based on this evidence.

Accordingly, Jedson's Motion for Summary Judgment on Trespass and Civil Conspiracy Claims (Doc. 76) is DENIED to the extent Jedson seeks summary judgment on its claim for civil conspiracy; and Defendant Spirit Construction Services' Motion for Partial Summary Judgment on Plaintiff's Civil Conspiracy and Good Faith and Fair Dealing Claims (Counts 17-20) (Doc. 92) is DENIED to the extent it seeks summary judgment on Jedson's claim for civil conspiracy.

### G.    Breach of Duty of Good Faith and Fair Dealing against Spirit (Counts XVIII, XIX, XX)

Spirit argues that it is entitled to summary judgment on Jedson's claims of breach of duty of good faith and fair dealing, which are brought against Spirit only.  (Doc. 92.)

Spirit argues that Jedson has not alleged that Spirit acted in bad faith in its performance or enforcement of the contract for the Lincoln or Cellynne Projects.  Spirit also argues that there was no contract between Jedson and Spirit on the Doubletree Project, and because the duty of good faith originates from a contractual relationship, the duty cannot exist until the underlying contract is formed.

The Court finds that Spirit is entitled to summary judgment, but not for the exact reasons argued by Spirit.  In Ohio, there is no separate tort cause of action for breach of good faith that is separate from a breach of contract claim.  *Northeast Ohio College of Massotherapy v. Burek*, 759 N.E.2d 869, 875 (Ohio Ct. App. 2001), *citing Lakota Local*

*School Dist. v. Brickner*, 671 N.E.2d 578, 584 (Ohio 1996).  Instead, "good faith is part of a contract claim and does not stand alone."  *Id.*  Jedson has not brought a claim for breach of contract.  Therefore, Jedson's claim for breach of good faith fails as a matter of law.

Accordingly, Defendant Spirit Construction Services' Motion for Partial Summary Judgment on Plaintiff's Civil Conspiracy and Good Faith and Fair Dealing Claims (Counts 17-20) (Doc. 92) is GRANTED to the extent it seeks summary judgment on Jedson's claims for breach of good faith and fair dealing (Counts XVIII, XIX, XX).

### H.  Computer Fraud Abuse Act against Baisch (Count XVII)

Baisch argues that it is entitled to summary judgment on Jedson's claim under the Computer Fraud and Abuse Act ("CFAA"), which is brought against Baisch only.  (Doc. 102.)

While the CFAA is primarily a criminal statute, CFAA permits "[a]ny person who suffers damage or loss by reason of a violation of this section [to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).  Baisch argues that Jedson cannot show that it suffered "damage or loss" as defined by the statute.

Under the statute, the term "loss" means:

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

*Id.*, § 1030(e)(11).  The term "damage" means "any impairment to the integrity or availability of data, a program, a system, or information, that . . . causes loss aggregating at least $5,000 in value during any 1-year period to one or more individuals . . . ."  *Id.*, §

1030(e)(8).

Jedson points to the declaration of Mike Schnell, who was involved in the set-up and management of the Lincoln Project website.  (Doc. 112-1)  Schnell states that as a result of the unauthorized access of the website by Baisch, he was asked to investigate ways to make the website more secure.  (Id., ¶ 5.)

Baisch argues that Jedson cannot recover for costs associated with investigating ways to make the website more secure.  Baisch maintains that the statute only allows recovery for costs associated with investigating and remedying damage to a computer, or a cost incurred because the computer's service was interrupted.  However, the statute itself provides  that losses comprise costs incurred in "responding to an offense: and "restoring the data, program, system or information to its condition prior to the offense."  18 U.S.C. § 1030(e)(11).  Therefore, the Court finds that under this language of the statute Jedson can recover for costs associated with investigating ways to make the website more secure.

Next, Baisch argues that Jedson's claim is barred by the statute's two-year statute of limitations.  Baisch argues that the statute began to run when Baisch accessed the Lincoln Project website in August of 2006.

Section 1030(g) provides: "No action may be brought under this subsection unless such action is begun withing 2 years of the date of the act complained of or the date of the discovery of the damage."  Jedson filed its initial complaint on June 18, 2008 and amended its complaint on November 17, 2008 to include its claim for a violation of the CFAA.  Baisch has not argued that Jedson's amendment to its complaint does not relate back to the original complaint.  Federal Rule of Civil Procedure 15(c)(2) states that:

An amendment of a pleading relates back to the date of the original pleading

when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

The Court finds that Jedson's claims under CFAA arose out of the conduct set forth in the original complaint. Therefore, Jedson's claims are not barred by the two-year statute of limitations.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Non-Copyright Claims (Counts 8-16) (Doc. 102) is DENIED to the extent Baisch seeks summary judgment on Jedson's claim under Computer Fraud Abuse Act against Baisch (Count XVII)

## I.     **Digital Millennium Copyright Act, 17 U.S.C. § 1202 (Count XXI)**

Baisch argues that it is entitled to summary judgment on Jedson's claim pursuant to 17 U.S.C. § 1202(a), a provision of the Digital Millennium Copyright Act ("DMCA"). (Doc. 97.)

The DMCA prohibits the intentional removal or alteration of "copyright management information."[8]  The Act defines "copyright management information" as:

---

[8]17 U.S.C. § 1202(b)(1) provides:

(b) Removal or alteration of copyright management information.--No person shall, without the authority of the copyright owner or the law--

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of, and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

(5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

(6) Terms and conditions for use of the work.

(7) Identifying numbers or symbols referring to such information or links to such information.

(8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

17 U.S.C. § 1202(c).  In ruling upon Jedson's Motion to Amend its Complaint, this Court found that Jedson's title block information on its drawings qualifies as "copyright management information" under the DMCA.  (Doc. 81.)

Baisch asks this Court to yet again reconsider a previous ruling.  Baisch again argues that Jedson's title block is not part of an automated copyright protection or management system.  Baisch maintains that while the title block includes the Jedson logo,

it does not identify Jedson as the author or owner of the drawings.  As the Court noted its previous ruling, the title block includes Jedson's name, address, and telephone number. This information qualifies as "copyright management information" under the DMCA.  The statute does not require that the author or owner of the copyright be specifically identified. Therefore, the Court finds no reason to reconsider its previous ruling that Jedson's title block is part of a copyright protection or management system.

Baisch argues that even if the title block constitutes copyright management information, Jedson has not shown that removal or alteration was intentional.  Baisch maintains that it was told by Spirit that Spirit had the rights to the drawings.  To the extent that Baisch argues that it did not know it was removing the copyright management information, the Court finds that argument without logic.  Baisch specifically requested access to the drawings in a format from which it could "import and modify."  (Doc. 78, Ex. 4.)  At most, there is a genuine issue of material fact as to whether Baisch actually did remove the information.

To the extent that Baisch argues that it did not have actual knowledge that the removal of the information would "induce, enable, facilitate, or conceal an infringement of the federal copyright laws," the Court finds this argument unavailing.  Section 1202(b) provides:

No person shall, without the authority of the copyright owner or the law-

(1) intentionally remove or alter any copyright management information

. . .

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under [federal copyright law].

17 U.S.C. § 1202(b). There is evidence that Baisch had reasonable grounds to know that removal of the information would "induce, enable, facilitate, or conceal an infringement of the federal copyright laws." In its agreement with Spirit, Baisch insisted on an indemnification clause to protect itself if there was an issue regarding the rights to Jedson's drawings. (Doc. 99-8, Kurt Kloehn Dep. at 65-66.) This evidence creates a genuine issue of material fact as to whether Baisch had reasonable grounds to know that the removal of the information would "induce, enable, facilitate, or conceal an infringement of the federal copyright laws."

Next, Baisch argues that while there might be evidence that it "cut and pasted" information from Jedson's drawings, there is no evidence that Baisch actually removed or altered the title block. The Court finds that the distinction that Baisch attempts to make is without a difference. Regardless of the means, there is a genuine issue of material fact as to whether Baisch removed the copyright management information.

Accordingly, Baisch's Motion for Summary Judgment on Plaintiff's Claim for Violation of 17 U.S.C. 1202 (Count 21) (Doc. 97) is DENIED.

## III.   **CONCLUSION**

Based on the foregoing, it is hereby **ORDERED** that:

1.   Plaintiff's Motion for Partial Summary Judgment (Doc. 75) is GRANTED;

2.   Plaintiff's Motion for Summary Judgment on Trespass and Civil Conspiracy Claims (Doc. 76) is GRANTED in PART and DENIED in PART;

    a.   Plaintiff is entitled to summary judgment on its claim for trespass;

    b.   Plaintiff is not entitled to summary judgment on its claim for

civil conspiracy;

3. Plaintiff's Motion for Partial Summary Judgment on Intentional Interference with Prospective Economic Advantage Claim (Doc. 78) is DENIED;

4. Defendants' Motion for Partial Summary Judgment on Plaintiff Jedson Engineering, Inc.'s Copyright Infringement Claims (Counts 1-6) (Doc. 89) is DENIED;

5. Plaintiff's Motion for Partial Summary Judgment on Copyright Counts I - IV (Doc. 90) is DENIED;

6. Defendant Spirit Construction Services' Motion for Partial Summary Judgment on Plaintiff's Civil Conspiracy and Good Faith and Fair Dealing Claims (Counts 17-20) (Doc. 92) is DENIED in PART and GRANTED in PART;

    a. Spirit is not entitled to summary judgment on Jedson's claim for civil conspiracy;

    b. Spirit is entitled to summary judgment on Jedson's claims for breach of good faith and fair dealing (Counts XVIII, XIX, XX) and these claims are DISMISSED;

7. Defendant Baisch Engineering's Motion for Summary Judgment on Plaintiff's Claim for Violation of 17 U.S.C. 1202 (Count 21) (Doc. 97) is DENIED;

8. Defendants' Motion for Summary Judgment on Plaintiff's Non-Copyright Claims (Counts 8-16) (Doc. 102) is GRANTED in PART and DENIED in PART;

    a. Defendants are entitled to summary judgment on Jedson's claims under the Ohio Trade Secrets Act (Counts VIII, IX, XII, X, XI, XIII) and these claims are DISMISSED;

    b. Defendants are not entitled to summary judgment on Jedson's claim for intentional interference with prospective economic advantage;

    c. Defendants are not entitled to summary judgment on Jedson's claim for trespass;

    d. Defendant Baisch is not entitled to summary judgment on

Jedson's claim under Computer Fraud Abuse Act against Baisch; and

9.    Baisch Engineering's Motion for Summary Judgment on Counts 1-6 (Doc. 104) is DENIED.

**IT IS SO ORDERED.**

_____/s/ Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court